UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
)
DARIUS SILVA                          )
                    Plaintiff         ) Civil Action No.: 22-40141
                                      )
v.                                    )
                                      )
TOWN OF UXBRIDGE, UXBRIDGE PUBLIC )            **COMPLAINT**
SCHOOL DISTRICT, FRANK TIANO,         )             **and**
MICHAEL RUBIN, MICHAEL DIMEGLIO, )           **JURY DEMAND**
BOB MARTELLIO, and JOHN DOES 1        )
through 20, in their individual and official )
capacities;                           )
                    Defendants        )
_____ )

## I. INTRODUCTION

The Town of Uxbridge, the Uxbridge Public School District

("UPSD"), former Uxbridge Superintendent of Schools, Frank Tiano

("Tiano"), Uxbridge High School Principal Michael Rubin ("Rubin"),

Uxbridge High School Assistant Principal Michael Dimeglio

("DiMeglio") and former Uxbridge High School football coach Bob

Martellio ("Martellio") are liable for harm suffered by Plaintiff Darius

Silva while he was a student at Uxbridge High School ("UHS").

Defendants fostered an environment of pervasive racial discrimination

and harassment and were responsible for other violations of Plaintiff's civil rights as detailed herein.

## II. JURISDICTION

1. This action is brought pursuant to 42 U.S.C. § 1983, 42 U.S.C. § 1988, and 42 U.S.C. § 2000d.

2. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343.

3. This Court also has pendent jurisdiction under 28 U.S.C. §1367 over the related claims pursuant to state law.

4. This court has personal jurisdiction over all Defendants because, at the time of the facts herein they resided within the Commonwealth of Massachusetts and were employed by the UPSD, an administrative district within the Commonwealth of Massachusetts. Furthermore, the Town of Uxbridge is a municipality within the Commonwealth.

## III. VENUE

5. Pursuant to 28 U.S.C. § 1391 venue is proper in the District of Massachusetts, the jurisdictional district in which the claim arose and in which, at relevant times, all defendants conducted business and resided.

## IV. PARTIES

6.  The Plaintiff, DARIUS SILVA (D/O/B 01/08/2002) is an individual
    who lives at 336 Crownshield Avenue, Town of Uxbridge, County of
    Worcester, Massachusetts.

7.  Defendant, TOWN OF UXBRIDGE (UXBRIDGE TOWN HALL),
    Uxbridge, Massachusetts, is a duly organized municipal corporation and
    public employer under the laws of the Commonwealth of
    Massachusetts.

8.  The defendant UXBRIDGE PUBLIC SCHOOL DISTRICT is a local
    administrative district under the Massachusetts Department of
    Elementary and Secondary Education and is located in Uxbridge, MA.

9.  The defendant FRANK TIANO is an individual whose current domicile
    is unknown to Plaintiff but was employed as Superintendent of Schools
    by the Uxbridge Public School District and is named here in his
    individual capacity for actions taken in the scope of his employment and
    under color of state law.

10. The defendant, MICHAEL RUBIN, is an individual whose current
    domicile is unknown to plaintiff but who is steadily employed by the
    Uxbridge Public School District.  Defendant RUBIN is named here in

his individual capacity for actions taken in the scope of his employment and under color of state law.

11. The defendant, MICHAEL DIMEGLIO, is an individual whose current domicile is unknown to plaintiff but who is steadily employed by the Uxbridge Public School District.  Defendant DIMEGLIO is named here in his individual capacity for actions taken in the scope of his employment and under color of state law.

12. The defendant, BOB MARTELLIO, is an individual whose current domicile is unknown to plaintiff but was employed by the Uxbridge Public School District.  Defendant MARTELLIO is named here in his individual capacity for actions taken in the scope of his employment and under color of state law.

13. Defendants, JOHN DOES 1 through 10, whose identities are currently unknown, represent those employees of the TOWN OF UXBRIDGE and UXBRIDGE PUBLIC SCHOOL DISTRICT and had personal involvement in the actions against of plaintiff, DARIUS SILVA.

## V. <u>JURY TRIAL DEMAND</u>

14. Plaintiff hereby demands a trial by jury on all issues so triable.

## VI. <u>FACTS COMMON TO ALL COUNTS</u>

15. Darius Silva was a standout multisport (baseball, wrestling, and football) student athlete during his first two years at Cumberland High school, where he was named Scout player of the year at defensive back for football, was on the championship wrestling team, and was named to the varsity wrestling team as a sophomore, but he began to struggle with his academics and was diagnosed with ADHD so his parents made the decision to transfer him to Uxbridge High School (UHS) in the fall of 2018  for its smaller class size and greater resources in hopes that it would provide him better academic opportunities.

16. Darius immediately felt like he stood out in a negative way as he was ostracized by some of the other students who began to refer to his as a "colla" and laugh at him when referring to him by this moniker.

17. Darius asked a local student he befriended what "colla" meant and was told that it was the local slang used as a substitute for the word, "nigger" and this was later confirmed by one of the involved students and school staff.

18. Darius is a student of color and was shocked and deeply wounded by the blatant racism displayed towards him by the other students of UHS, which has a student population of approximately 89% white, 2% black,

and 3% multiracial[1], but did not react at first because he was afraid to make waves as a brand-new student and wanted to be accepted by his peers and teammates.

19. Darius was subjected to ongoing and pervasive racial abuse by teammates and Coach Bob Martellio, who would consistently refer to Darius derogatorily as, "boy" and would not call him by his name.

20. Darius persisted through the abuse and tried out for the baseball team in March of 2019, made the varsity team and became aware of a group text used by the baseball team where one of the other students, Ben Landry, sent a message to a friend of Darius, telling him to "shut up" or he will "call the cops and tell them you are driving that COLLA around."

21.  Darius reported the abuse to the principal and Landry was removed from the baseball team, but this only made things worse for Darius as he became the target of relentless racial discrimination from Landry, other students, and the coach in retaliation for telling on the abuser and the school failed to adequately address the behavior or protect Darius.

22. Around this time, another student called Darius a "colla" in class.

23. On March 21, 2019, two different students cornered Darius at lunch and

---

[1] Statistical Data cited by Office for Civil Rights Region 1 Complaint No. 01-19-1245 Outcome letter dated December 3, 2019. See OCR Outcome Letter, attached here as Exhibit 1, at p. 2.

attempted to assault him for "snitching on their friend."

24. On March 22, 2019, a student posted on social media that Darius was a
    snitch and the word "snitch" and "Darius is a little bitch" were written
    on the walls of the locker room.

25. In May of 2019, A student filmed a video of Darius walking and
    narrated, "look at this stupid "colla"" and posted this video to social
    media.

26. The varsity baseball coach failed to play Darius in any regular season
    game and discriminated against him by making him the only varsity
    player to wear a junior varsity uniform as retaliation.

27. The coach held a meeting with the team in March of 2019 to "air out
    some of the issues and help with the healing" but the coach was late to
    the meeting, made no mention of racial discrimination, did not address
    the use of racial slurs and only indicated that unsportsmanlike behavior
    would not be tolerated.

28. The school referred the March 2019 incidents to the district's Title VI
    coordinator who investigated, which resulted in a finding that "there
    was racial harassment and a hostile environment," that "the racial
    harassment had been ongoing," and "subsequent actions taken by
    students were retaliatory in nature leading to a racially hostile

environment that may be interfering with UHS students' ability to access and engage in their education." *See* OCR Outcome Letter, attached here as <u>Exhibit 1</u>, at p. 3.

29. The report outlined remedial recommendations and was transmitted to the principal and superintendent, neither of which shared the results of said report with Darius or his parents, despite the finding of misconduct and they did not follow through with the remedial recommendations not limited to but including, providing counseling for the students responsible for the harassment, providing counseling for Darius, training or other interventions to the larger community, review and revisions of anti-harassment policies and reporting procedures, and the creation of proactive measures to prevent recurrence. *Id*. at 3-4.

30. Darius and his parents only learned of the completion of the investigation when they contacted the principal on April 22, 2019, and the principal minimized the outcome of the report by indicating that the "investigator found that a violation did occur" and that "there have been some consequences that we have imposed and there are other steps that we are taking to mitigate recurrence." *Id*. at 4.

31. Neither the principal nor superintendent ever informed Darius or his parents about what steps were actually taken and there was no

objectively observable action taken to assist Darius in dealing with the trauma he had already suffered, and they failed to take measures to mitigate recurrence. *Id*.

32. The other baseball players shunned Darius and continued to threaten and make him feel unsafe and the coach benched him and did nothing to help him, leading to his quitting the baseball team on or about May 16, 2019.

33. Darius spoke to principal Michael Rubin about the continuous racial harassment and requested that one of the lead offenders, Michael Landry not be allowed to walk with his peers at graduation, but the principal told Darius to "be strong and move on" and "I'm sorry, but this is not a big enough issue for me to take away that privilege."

34. Darius said he wanted to meet with Superintendent Frank Tiano with his mother and questioned Principal Rubin's ability to help him and asked him if he cared and was told by Rubin, "this is your fault." Darius left the meeting.

35. At football practice on June 6, 2019, Darius was gains subjected to racial harassment when a student named Joe Blair, called out, "fuck that nigger, send him back to where he came from, he doesn't belong here. Yo Eli, are you a nigger lover too?"

36. On June 6, 2019, another student Erik Neitz stated, "what are you a nigger lover? Don't worry this stupid nigger is gonna be gone by next year" within the presence of a teacher.

37. On June 6, 2019, UHS football coach Bob Martellio, harassed Darius at practice by continually confronting him and getting really close to his person and taunting him by saying, "what's wrong Darius, am I bothering you? What's wrong Darius, do I make you feel uncomfortable, just talk to me" laughing the entire time.

38. Due to the improper handling of the situation and failure to protect Darius, his parents filed a complaint with the Office for Civil Rights, Complaint Number 01-19-1245, on June 6, 2019.

39. On June 9, 2019, Darius's family home was vandalized at night by someone who sped away in a vehicle after smashing his and two neighbors' mailboxes, in what Darius believes was in retaliation for his continued pursuit of justice from racial discrimination. A police investigation was unable to identify the perpetrators.

40. Coach Bob Martellio was investigated for use of racial slurs and discriminatory behavior and allowed to resign from the school in July of 2019.

41. After Coach Martellio "resigned" Darius was targeted by other players

on the football team during practice by being hit low, hit late, punched

in the stomach when the players were in a pile, he had items like mouth

guards stolen, and his sneakers hidden so that he had to go home

without sneakers after practice.

42. The Office for Civil Rights (OCR) sent an outcome letter to Darius's

father on December 3, 2019 notifying him that they had opened an

investigation to determine whether during the 2018-2019 school year,

Darius was subjected to a race-based hostile environment and, if so,

whether the District responded inadequately, in violation of 34 C.F.R

Section 100.3(a) and (b), and that prior to the conclusion of their

investigation, The District expressed a willingness to resolve the

complaint by taking steps set out in a Resolution Agreement between

the District and OCR. *Id.* at 1.

43. OCR made some preliminary findings, including but not limited to, that

the District failed to share with the parents or student whether particular

allegations made by the student had been substantiated or any remedial

measures the District was taking in response, including any measures to

remedy the effect of harassment on the student, The principal conducted

an optional meeting for staff on March 21, 2019 to discuss the "race

comments" and how teachers should respond, including being vigilant

about whether they hear the use of the word "colla," there were no notes
documenting the District's response to the incident that occurred on
March 22, 2019, but they did refer four March 2019 racial harassment
complaints to the District's Title VI coordinator, the Title VI
coordinator conducted an investigation which concluded that "there was
racial harassment and a hostile environment," that "the racial
harassment had been ongoing," and "subsequent actions taken by
students were retaliatory in nature leading to a racially hostile
environment that may be interfering with UHS students' ability to
access and engage in their education," the report made remedial
recommendations, the coordinator emailed the report to the principal
and superintendent, but did not have any role in coordinating, or
overseeing the implementation of the recommendations and the District
failed to communicate any of this information to the parents or student,
there was no evidence or documentation that the District provided any
students with the counseling recommended in the report, the
investigative reports failed to document who engaged in misconduct, the
District does not have a system to track racial harassment incidents, the
Title VI coordinator does not have a way to track racial harassment
incidents that the District does not bring to her attention for formal

investigation, and the District did not provide any evidence to OCR demonstrating a response to the June 6, 2019, racial harassment complaints, and the District may not have followed through with reasonable or effective steps to eliminate the hostile environment for the student. *Id*. at 1-6.

44. Darius transferred to Northbridge High School for his senior year due to the District's inability to provide a safe learning environment free from racial discrimination.

45. Darius suffered significant emotional trauma and distress requiring mental health counseling that the district did not provide or offer despite the recommendations of the District's Title VI coordinator to do so.

46. Darius missed out on collegiate athletic scholarship opportunities for baseball and or football due to the lack of playing time and exposure due to the racial discrimination suffered at UHS.

47. Defendants' failure to take meaningful action to protect Darius from persistent and ongoing racial harassment and a hostile environment are a direct and proximate cause of plaintiff's injuries.

## <u>COUNT ONE:  VIOLATION OF 42 U.S.C. § 1983 (ALL INDIVIDUAL DEFENDANTS)</u>

48.  Plaintiff repeats and reasserts each and every allegation above stated as though such allegations were set forth herein.

49.  Under the Equal Protection Clause of the Fourteenth Amendment, Plaintiff has the right to equal access to an educational environment free from harassment and discrimination on the basis of race.

50.  Defendants violated Plaintiff's right to equal protection of the laws on the basis of his race by acting with deliberate indifference to Plaintiff's reports of racial harassment and discrimination, as well as to the racially hostile education environment Plaintiff suffered because of Defendants' failure to take meaningful corrective action. Defendants deliberate indifference included, without limitation:

a) Ignoring or minimizing racial slurs repeatedly used by white students against Plaintiff;

b) Refusing to take meaningful action to address reports of race-based physical assaults against Plaintiff;

c) Ignoring reports of racial harassment and discrimination made by

students and parents on behalf of Plaintiff;

d) Creating a hostile educational climate that tolerates racial

harassment and discrimination, including bodily harm and the threat

of the same to Plaintiff;

e) Failing to appropriately discipline Caucasian students and staff who

subjected Plaintiff to racial harassment or discrimination;

f) Failing to take meaningful action to correct the conditions causing

the racial harassment and discrimination and to prevent its recurrence;

and

g) Failing to provide adequate training for its administrators and

employees to prevent and address racial harassment and

discrimination despite having notice that its procedures were

inadequate and resulting in a violation of Plaintiff's constitutional

rights.

51. Defendants actions and decisions have deprived Plaintiff of the

privileges and immunities secured by the U.S. Constitution and laws, in

violation of 42 U.S.C. § 1983.

52. As a direct and proximate result of Defendants violation of Plaintiff's

equal protection rights under the Fourteenth Amendment, Plaintiff has

suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages and losses, including, but not limited to: emotional distress, fear, anxiety and trauma; lost future earnings and earning capacity; and other damages.

53. The above constitutes violations of 42 U.S.C. § 1983 et seq.

54. As a result of Defendants' equal protection violation, Plaintiff is also entitled to his attorneys' fees and costs.

## COUNT TWO: VIOLATION OF 42 U.S.C. § 1983 AGAINST TOWN OF UXBRIDGE and UXBRIDGE PUBLIC SCHOOL DISTRICT

55. Plaintiff repeats and reasserts the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

56. Under the Equal Protection Clause of the Fourteenth Amendment, Plaintiff has the right to equal access to an educational environment free from harassment and discrimination on the basis of race.

57. At all relevant times, Defendants had unconstitutional customs, policies, or practices of (a) failing to appropriately investigate and respond to reports of racial harassment and discrimination, including reports by Plaintiff and his family; (b) failing to enforce its policies prohibiting discrimination and harassment when victims are People of Color; and

(c) failing to adequately train Defendants' administrators and employees on how to recognize, address, and prevent racial harassment and discrimination against its students.

58. Defendants followed these unconstitutional customs, policies and practices not only with regard to Plaintiff, but also with regard to racial harassment of other People of Color at its schools.

59. Defendants' unconstitutional customs, policies, or practices constituted disparate treatment of People of Color based on their race, in violation of the Equal Protection Clause.

60. Defendants' customs, policies, and practices for responding to reports of racial harassment and discrimination, including Plaintiff's reports, were so clearly inadequate that they give rise to a reasonable inference that Defendant consciously acquiesced in the harassment and discrimination.

61. Defendants violated Plaintiff's right to equal protection of the laws on the basis of their race by acting with deliberate indifference to Plaintiff's reports of racial harassment and discrimination, as well as to the racially hostile education environment Plaintiff suffered because of Defendants' failure to take meaningful corrective action. Defendants' deliberate indifference included, without limitation:

a) Ignoring or minimizing racial slurs repeatedly used by white students against Plaintiff;

b) Refusing to take meaningful action to address reports of race-based physical assaults against Plaintiff;

c) Ignoring reports of racial harassment and discrimination made by students and parents on behalf of Plaintiff;

d) Creating a hostile educational climate that tolerates racial harassment and discrimination, including bodily harm and the threat of the same to Plaintiff;

e) Failing to appropriately discipline Caucasian students and staff who subjected Plaintiff to racial harassment or discrimination;

f) Failing to take meaningful action to correct the conditions causing the racial harassment and discrimination and to prevent its recurrence; and

g) Failing to provide adequate training for its administrators and employees to prevent and address racial harassment and discrimination despite having notice that its procedures were inadequate and resulting in a violation of Plaintiff's constitutional rights.

62. Defendants' actions and decisions have deprived Plaintiff of the privileges and immunities secured by the U.S. Constitution and laws, in violation of 42 U.S.C. § 1983.

63. As a direct and proximate result of Defendants' violation of Plaintiff's equal protection rights under the Fourteenth Amendment, Plaintiff has suffered and continues to suffer losses of educational opportunities and benefits, along with injuries, damages, and losses, including, but not limited to: emotional distress, fear, anxiety and trauma; lost future earnings and earning capacity; and other damages.

64. The above constitutes violations of 42 U.S.C. § 1983 et seq.

65. As a result of Defendants' equal protection violation, Plaintiff is also entitled to his attorneys' fees and costs.

66. Therefore, the Town as an entity, is liable to the plaintiff per 42 U.S.C. § 1983.

## COUNT THREE:  VIOLATION OF Title VI, 42 U.S.C. § 2000d (ALL DEFENDANTS)

67. Plaintiff repeats and reasserts the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

68. 42 U.S.C. § 2000d, commonly referred to as Title VI, and its

    implementing regulations prohibit discrimination in a federally funded

    school on the basis of a student's race.

69. Specifically, 42 U.S.C. § 2000d provides that "No person in the United

    States shall, on the ground of race, color, or national origin, be excluded

    from participation in, be denied the benefits of, or be subjected to

    discrimination under any program or activity receiving Federal financial

    assistance."

70. Defendants are recipients of federal funds.

71. Plaintiff was subjected to harassment, discrimination, and disparate

    treatment on the basis of their race.

72. Defendants had notice of the racial hostility occurring at Uxbridge high

    school. A number of incidents were reported to school administration.

    The district failed to take remedial measures to prevent further

    discrimination of the Plaintiff and other students of color allowing the

    behavior to continue and permeate throughout the school district.

73. Racial hostility permeated Uxbridge High School of such severity and

    pervasiveness as to significantly alter the conditions of Plaintiff's

    educational environment resulting in physical attacks and emotional

distress and thereby denying Plaintiff equal access to the school's resources and opportunities.

74. Defendants, despite actual knowledge and adequate opportunity to learn of this misconduct, failed to act to remedy the harassment, discrimination, and disparate treatment of Plaintiff.

75. As a direct result of the actions and conduct of Defendants, Plaintiff suffered and continue to suffer emotional distress, loss of companionship, loss of educational opportunities, and other damages.

76. As a result of Defendants' violation, Plaintiff is also entitled to his attorneys' fees and costs.

## COUNT FOUR:  MASSACHUSETTS TORT of NEGLIGENCE (ALL DEFENDANTS)

77. Plaintiff repeats and reasserts the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

78.  The Defendants breached their duty of reasonable care by negligently acting or failing to act in such a way that resulted in injury to Darius Silva.

79.  Defendants refused to properly and fully discharge their responsibilities by, among other things, failing to adequately act to remedy the racial harassment, discrimination, and disparate treatment of Plaintiff, failing to provide counseling or treatment to address the emotional distress suffered by Plaintiff.

80.  As a direct and proximate result of Defendants' actions, Plaintiff suffered the damages described above.


## COUNT FIVE:  INTENTIONAL INFLICTION of EMOTIONAL DISTRESS   (ALL DEFENDANTS)

81.  Plaintiff repeats and reasserts the allegations contained in the above paragraphs and incorporates them by reference as if fully and completely set forth herein.

82.   The Defendants caused Plaintiff emotional distress, and/or acted in reckless disregard of the likelihood of causing the Plaintiff emotional distress, in committing these acts.

83.   As a direct and proximate result of Defendants' actions, Plaintiff continues to suffer mental anguish and emotional distress, as well as the damages described above.

**WHEREFORE**, Plaintiff requests that this Court:

1. Enter judgment in favor of the plaintiff and against the defendants on all Counts of the Complaint;

2. Award compensatory damages to Plaintiff and against defendants, individually and jointly in an amount to be determined at trial;

3. Award punitive damages to Plaintiff and against defendants, individually and jointly in an amount to be determined at trial;

4. Award Plaintiff recovery of cost of this action, including reasonable attorneys' fees; and

5. Award such other further relief as this court may deem necessary and appropriate.

RESPECTFULLY SUBMITTED,
For the Plaintiff
By his Attorneys

/s/ Maria F. Deaton, Esq.
Maria F. Deaton, Esq. (BBO# 645784)
LYNCH & PINE, ATTORNEYS AT LAW
One Park Row, 5th Floor
Providence, RI 02903
401-274-3306
mdeaton@lynchpine.com

Dated: December 5, 2022

23

# EXHIBIT 1



**UNITED STATES DEPARTMENT OF EDUCATION**
**OFFICE FOR CIVIL RIGHTS, REGION I**
**5 POST OFFICE SQUARE, 8th FLOOR**
**BOSTON, MASSACHUSETTS 02109-3921**

December 3, 2019

David Silva
Via Email: silvaback22@gmail.com

Re:    Complaint No. 01-19-1245
       <u>Uxbridge Public Schools</u>

Dear David Silva:

This letter is to advise you of the outcome of the complaint that the U.S. Department of Education (Department), Office for Civil Rights (OCR) received against Uxbridge Public Schools (District). You allege that the District discriminated against your son (Student) on the basis of race. Specifically, the complaint alleges that during the 2018-2019 school year, the Student was subjected to various forms of racial harassment by peers and coaches at Uxbridge High School (UHS), and that the District has failed to respond appropriately after being notified of the alleged harassment. The racial harassment included the Student being called racial slurs by peers; being called derogatory names and treated unfairly by at least one coach; being physically intimidated by peers for complaining about racial harassment; and being forced to wear a different uniform than others on the baseball team.  As explained further below, before OCR completed its investigation, the District expressed a willingness to resolve the complaint by taking the steps set out in the enclosed Resolution Agreement (Agreement).

OCR enforces Title VI of the Civil Rights Act of 1964 (Title VI), 42 U.S.C. Section 2000d *et seq.*, and its implementing regulation at 34 C.F.R. Part 100, which prohibit discrimination on the basis of race, color, or national origin in any program or activity receiving federal financial assistance from the Department. Because the District receives federal financial assistance from the Department, OCR has jurisdiction over it pursuant to Title VI.

OCR opened the following legal issue for investigation:

☐    Whether during the 2018-2019 school year, the Student was subjected to a race-based hostile environment and, if so, whether the District responded inadequately, in violation of 34 C.F.R. Section 100.3(a) and (b).

***Summary of Preliminary Investigation***

During its preliminary investigation, OCR reviewed documents provided by the Complainant and the District and interviewed three District witnesses: the UHS Principal (Principal), the District's Title VI Coordinator (TVI Coordinator) and the UHS Baseball Coach (Coach). Before OCR completed its investigation, the District expressed a willingness to resolve the complaint.

*The Department of Education's mission is to promote student achievement and preparation for global competitiveness*
*by fostering educational excellence and ensuring equal access.*

*www.ed.gov*

25

Page 2 – OCR Complaint No. 01-19-1245

The Student is a biracial student who transferred to UHS in the fall of 2018 and was enrolled in the eleventh grade during the events under investigation. UHS is 89% white, about 2% African American, and about 3% multiracial.  The Complainant is the Student's father.

The Complainant alleges that shortly after the Student transferred to UHS in fall 2018, some students on the football team began calling the Student a "colla," which the parties now agree is code for the N-word at UHS.  Although the Complainant concedes that the family did not notify the District of the racial slurs directed at the Student in fall 2018, the Complainant notified the District of a series of events that occurred in March 2019 and June 2019, which are described below.

*March 2019*

    ☐  On March 20, 2019, another student (Student B) sent a group text amongst the baseball team telling a friend of the Student that the friend better shut up "before he tells the cops he drives that colla around."  The text was apparently a reference to the fact that the friend drove the Student to and from baseball practice.

    ☐  Around this time, another student (Student C) called the Student "a colla" in class.

    ☐  On March 21, 2019, two different students (Students D and E) cornered the Student at lunch and attempted to assault him in retaliation for the Student reporting Student B and C's comments to the Assistant Principal and getting their friend, Student B, thrown off the baseball team.  The assault was broken up before it began.

    ☐  On March 22, 2019, Student B posted comments on Twitter about the Student being a rat (which was "liked" by Student D) and on that day a phrase about "[the Student] being a rat" was scratched into the boy's locker room.

*May 2019*

    ☐  On May 28, 2019, Student C made a comment "look at this stupid colla" while taking a video of the Student, and put a video of himself saying it on Snapchat.

*June 2019*

    ☐  On June 6, the same day the Complainant filed with OCR, another student called the Student "colla" which led to an argument between the two students.

In addition to the above complaints about racial harassment by students, the Complainant also alleges that the Coach did not play the Student for a single regular season baseball game.  The complaint concedes that the Student missed several practices for injuries, a family vacation, and deaths in the family.  The complaint also alleges that the Student was the only student forced to wear a junior varsity uniform on the varsity team.  The Student allegedly quit the baseball team as a result of this treatment.

Page 3 – OCR Complaint No. 01-19-1245

OCR's investigation to date shows that the District promptly responded in some form to all but one complaint raised by the Complainant. For instance, District staff conducted informal and formal investigations of the first three March 2019 incidents as well as the May 2019 incident, and assigned consequences as they would for other conduct-related issues.  The District did not share with the Complainant or the Student whether particular allegations made by the Student had been substantiated or any remedial measures the District was taking in response, including any measures to remedy the effect of the harassment on the Student.

In late March 2019, the Principal sent an email message denouncing the conduct to the entire school community, stating that "over the past couple of weeks, I have seen the well-being of some of our students compromised as a result of some prejudiced and bigoted comments directed by their peers…statements are being made that are racist, indefensible, and requiring a quick and coordinated response."  In addition, documentation provided by the District demonstrates that the Principal met with faculty at an optional meeting on March 21 to discuss the "race comment[s]" and how teachers should respond, including being vigilant about whether they hear the use of the word "colla." The Principal followed up with the faculty again on March 26, 2019.

The Complainant asserts that the District had informed him that the Coach would have "a meeting with the team airing out some of these issues and helping with the healing" on March 22, 2019. However, an email from the Complainant dated March 23, 2019, alleges that even though the baseball team met, the use of the racial slur was not addressed by the Coach.  The Coach, during his interview with OCR, stated that he was late to the meeting, the Principal and the Athletic Director addressed the team, and the message was that unsportsmanlike behavior would not be tolerated. OCR's investigation did not identify any evidence that the race-based harassment was specifically addressed during the baseball team meeting.

Although there are no notes documenting the District's response to the incident that occurred on March 22, 2019, the District formally referred the four March 2019 complaints of racial harassment to the District's TVI Coordinator for investigation on March 26.  On April 1, 2019, the Principal informed the Complainant that "the District has opened a formal investigation … regarding any violation of Title VI. … I will be waiting on the findings of the formal investigation before I am able to move forward with anything additional, if that is in fact a recommended course of action."

The District's TVI Coordinator interviewed all witnesses who she found had relevant information, and ultimately issued a report on April 8, 2019, that concluded that the investigation found evidence of racial harassment and hostile environment, that "racial harassment has been ongoing" and "the subsequent actions taken by students were retaliatory in nature leading to a racially hostile environment that may be interfering with UHS students' ability to access and engage in their education."  The report outlined remedial recommendations including, but not limited to, counseling for the students accused of harassment, and the Student, training or other interventions to the larger community, review and revision of anti-harassment policies and reporting procedures, and creating proactive measures to prevent recurrence.  Despite a finding of misconduct, the Report is silent as to the identity of the actors who engaged in prohibited behavior or potential sanctions for those students.  The TVI Coordinator emailed the report to the Principal and the Superintendent, which ended her involvement with the matter.  She had no role in coordinating or overseeing the implementation of her recommendations, and she does not know which of her suggestions, if any,

Page 4 – OCR Complaint No. 01-19-1245

were followed.  The TVI Coordinator also had no role in communicating the outcome of her investigation to the Complainant.

Indeed, it appears that the Complainant did not learn anything until he contacted the Principal on April 22 asking whether the investigation had been concluded and asking about the findings.  In response to the inquiry, the Principal stated that "an investigator found that a violation did occur," and that "there have been some consequences that we have imposed and there are other steps we are taking to mitigate any recurrence." The Principal stated that he "thought the investigator may have shared that with you, so I am sorry for not reaching out sooner."  After further inquiry by the Student's mother, on April 24, 2019, the Principal outlined steps in an email that UHS was undertaking in order to address the use of racial slurs and hostile environment issue: training of faculty, administrative team training on investigative procedures, developing a district wide strategic plan, introduction of an anonymous reporting feature, and integrating lessons into curriculum.  There is no indication in any of the materials provided to OCR by the District that the Student or any of the other students received counseling as recommended by the report.  During the onsite interview, the Principal acknowledged that the investigative reports do not say who engaged in misconduct and that information is not typically shared with complainants and/or their families.

When asked whether she tracked complaints of racial harassment, the TVI Coordinator responded that she uses her own notes as a tracking system, but she conceded that she does not have any way to track racial harassment incidents that the District does not bring to her attention for a formal investigation. The Principal indicated that the District uses an incident system to track student conduct issues, but it was unclear whether this system allows the District to identify incidents of racial harassment or retaliation.  The Principal also stated that perhaps not all incidents make it into the system.

On or about May 16, 2019, the Complainant informed the Principal by telephone that the Student had quit the baseball team, citing the Student's lack of playing time and being forced to wear a junior varsity uniform while on the varsity team. Upon hearing the Complainant's account, the Principal contacted the Coach and requested information responsive to the issues of playing time, game/practice attendance, junior varsity playing time, comparator information for other athletes. On May 21, 2019, the Coach submitted a memorandum to the Principal detailing reasons for the Student's lack of playing time and wearing a junior varsity uniform.  The Coach explained the reason for the Student's diminished playing time was his injury early in the playing season which resulted in "an extraordinary amount" of missed practices and games, along with a family vacation and deaths in the family that led him to miss more practices.  Regarding the use of the junior varsity uniform, the Coach explained that they had decided to go with a 19-athlete roster that year, even though they only had 16 uniforms, in order to build the team.  The Coach had hoped to buy a new fleet of uniforms that year to ensure every team member had a varsity uniform, but it didn't happen in time, and therefore there were several juniors on the varsity team who wore junior varsity uniforms that year. The Coach confirmed that the Student quit the team on May 15, 2019, despite the fact that the Coach tried to talk him out of it.

It is not clear what information the Principal communicated to the Complainant after the Coach submitted his memorandum.  On June 4, 2019, while emailing the Principal about new incidents of harassment, the Complainant again raised the issue that he believed that the Student's lack of

Page 5 – OCR Complaint No. 01-19-1245

playing time and wearing a junior varsity uniform was discriminatory. The Principal informed the Complainant that his May 2019 allegations about the baseball team were investigated, and offered the explanations offered by the Coach and the Principal's conclusion that it did not appear that the Student was treated differently than other students, although he stated he did understand "the other perspective" and the "optics."

Finally, with respect to the May 28 incident, it appears that the District informally investigated the SnapChat incident promptly and issued disciplinary consequences to Student C, informing the Complainant only that "we have taken disciplinary action against one Student."  With respect to the final incident raised directly by phone to the District's Title TVI Coordinator on June 6, 2019, the District did not provide any documentation to OCR demonstrating its response.

The Student transferred to a different high school after the fall 2019-2020 school year began.

### *Legal Standard*

Title VI prohibits discrimination on the basis of race, color, or national origin in any program or activity receiving federal financial assistance. Racial harassment that creates a hostile environment is a form of discrimination prohibited by Title VI. Once a recipient has notice of a racially hostile environment, the recipient has a legal duty to take reasonable steps to eliminate it. Thus, if OCR finds that the recipient took responsive action, OCR will evaluate the appropriateness of the responsive action by examining reasonableness, timeliness, and effectiveness.

### *Preliminary Analysis*

Before OCR completed its investigation, the District expressed a willingness to resolve the complaint by taking the steps set out in the enclosed Resolution Agreement (Agreement).

OCR's preliminary investigation indicates that the District timely responded to all but one complaint of racial harassment or retaliation alleged by the Complainant or the Student with an informal investigation conducted by District staff.  The only exception is the June 6 allegation noted in the complaint, for which the District did not provide any documentation.  In every other instance, the Principal or Assistant Principal appear to have interviewed relevant witnesses, made a determination about what occurred, and imparted consequences to the offending students pursuant to their generally applicable student conduct procedures. In addition, the District notified the school community about some of the incidents that occurred, denounced the racist conduct, and spoke to teachers and staff about the use of the word "colla" and racial discrimination in general.  Moreover, within a week of receiving complaints about the use of the word "colla" against the Student in March 2019, the District launched a formal Title VI investigation, where the TVI Coordinator appears to have interviewed relevant witnesses and made a finding that the Student had been subject to a hostile environment based on racially harassing and retaliatory conduct.

However, OCR is concerned that the District's response may not have followed through with reasonable or effective steps to eliminate the hostile environment for the Student.  Specifically, OCR is concerned that the District did not share with the Complainant or the Student its determination that racial harassment had occurred.  In addition, although the District may have

Page 6 – OCR Complaint No. 01-19-1245

disciplined the students found responsible for the harassing conduct and sent messages denouncing the conduct to the entire school community, it does not appear that the District considered what remedial action it should take to assist the Student in light of the hostile environment.  Finally, it appears that the District may not have responded to the final complaint of the use of the word "colla" that took place on June 6.  Overall, since the District handles some complaints of racial harassment at the school building level and others through the TVI Coordinator, the District may not be able adequately to identify all incidents of racial harassment for purposes of assessing and eliminating any hostile environment.

***Conclusion***

Prior to the conclusion of OCR's investigation and pursuant to Section 302 of OCR's *Case Processing Manual*, the District expressed an interest in resolving this complaint and OCR determined that a voluntary resolution is appropriate.  Subsequent discussions between OCR and the District resulted in the District signing the enclosed Agreement which, when fully implemented, will address all of the allegations raised in the complaint.  OCR will monitor the District's implementation of the Agreement.

This concludes OCR's investigation of the complaint.  This letter should not be interpreted to address the District's compliance with any other regulatory provision or to address any issues other than those addressed in this letter.  This letter sets forth OCR's determination in an individual OCR case.  This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such.  OCR's formal policy statements are approved by a duly authorized OCR official and made available to the public.  The Complainant may have the right to file a private suit in federal court whether or not OCR finds a violation.

Please be advised that the District must not harass, coerce, intimidate, discriminate, or otherwise retaliate against an individual because that individual asserts a right or privilege under a law enforced by OCR or files a complaint, testifies, assists, or participates in a proceeding under a law enforced by OCR.  If this happens, the individual may file a retaliation complaint with OCR.

Under the Freedom of Information Act, it may be necessary to release this document and related correspondence and records upon request.  If OCR receives such a request, we will seek to protect personally identifiable information that could reasonably be expected to constitute an unwarranted invasion of personal privacy if released, to the extent provided by law.

Sincerely,

Abra Francois
Compliance Team Leader

Enclosure