# UNITED STATES DISTRICT COURT
# DISTRICT OF MASSACHUSETTS

DARIUS SILVA,

     *Plaintiff*,

    v.

TOWN OF UXBRIDGE, UXBRIDGE
PUBLIC SCHOOL DISTRICT,
FRANK TIANO, MICHAEL RUBIN,
MICHAEL DIMEGLIO,
BOB MARTELLIO, and JOHN DOES
1 through 20 in their individual and official
capacities,

     *Defendants*.

Civil No. 22-cv-40141-MRG

## MEMORANDUM AND ORDER

**GUZMAN, J.**

Plaintiff Darius Silva, a former student at Uxbridge High School, brings claims against

the Town of Uxbridge, Uxbridge Public School District, Frank Tiano, Michael Rubin, Michael

DiMeglio, Bob Martellio, and John Does 1 through 20[1] in their individual and official capacities

(collectively, "Defendants"), alleging racial discrimination and harassment during his junior year

of high school. Plaintiff alleges violations of his constitutional rights under 42 U.S.C. § 1983,

violations of Title VI of the Civil Rights Act of 1964, negligence, and intentional infliction of

---

[1] Plaintiff has made no effort to name "John Does 1 through 20" or serve them with the Complaint. Because these fictitiously named parties remained unidentified at the close of discovery, the claims against them are dismissed. See Figueroa v. Rivera, 147 F.3d 77, 82-83 (1st Cir. 1998) (affirming dismissal of claims against John Doe defendants because plaintiff made no attempt to serve them with the complaint and summary judgment was ripe for resolution); O'Halloran v. Nationstar Mortg., LLC, No. 16-10211-JGD, 2017 WL 374465, at *1 n.1 (D. Mass. Jan. 25, 2017).

emotional distress. Pending before the Court are Defendants' Motion for Summary Judgment [ECF No. 19] and Defendants' Motion to Strike [ECF No. 24]. For the reasons stated below, Defendant's Motion to Strike is **DENIED** and Defendant's Motion for Summary Judgment is **GRANTED IN PART and DENIED IN PART**.

## I.    Background

Defendants filed a Statement of Material Facts [ECF No. 21 ("SOMF")] pursuant to L.R. D. Mass. 56.1 that accompanied their motion for summary judgment. Although Silva did not file a response to the SOMF, his opposition brief presents a version of the facts "[b]ased on both disputed and undisputed facts."[2] [ECF No. 22 at 2]. The Court will address any factual disputes, as well as their materiality, later in the opinion. For purposes of the factual background, the Court will primarily rely on the undisputed facts as presented to the Court.[3]

This case arises from allegations of racial discrimination and harassment suffered by Plaintiff Darius Silva ("Silva") during his time as a student at Uxbridge High School ("UHS") during the 2018-2019 school year. [SOMF ¶ 1; ECF No. 22 at 2]. Silva transferred to UHS from Cumberland High School in the fall of 2018 because his parents believed that a smaller school environment would better accommodate his ADHD and provide better academic opportunities. [SOMF ¶ 2; ECF No. 22 at 2]. During his time at UHS, Silva participated in football, wrestling, and baseball. [SOMF ¶ 4; ECF No. 22 at 2]. In March 2019, a senior member of the baseball team referred to Silva as "colla," a colloquial term for a racial slur, in a baseball team group text. [SOMF ¶ 6; ECF No. 22 at 3-4]. Silva reported this incident to Principal Michael Rubin

---

[2] Silva's opposition brief also notes that the version of event is based on his "Response to Defendant's Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment." [ECF No. 22 at 2]. The record reveals, however, that Silva never filed such response. Presumably, Silva intended to file it as a standalone document, as is customary, but ultimately incorporated it into his opposition brief.

[3] Fed. R. Civ. P. 56(c) allows Courts to consider both material cites and "other materials in the record." Therefore, when necessary, the Court will rely upon materials in the record to supplement the factual background.

("Principal Rubin" or "Rubin"), who took immediate action by removing the student from the baseball team. [SOMF ¶ 7; ECF No. 22 at 4]. Principal Rubin also created a crisis team comprised of administrators and teachers to address issues of discrimination and racism in the school, held a staff meeting to alert all staff of the incident, and spoke with Silva's teachers. [SOMF ¶ 9].

On March 21, 2019, two students confronted Silva at lunch and accused him of "snitching" on their teammate who had used the racial slur. [SOMF ¶ 10; ECF No. 22 at 4]. Assistant Principal Michael DiMeglio ("Assistant Principal DiMeglio" or "DiMeglio") was assigned to investigate the incident, and meetings were held with the students involved and their parents. [SOMF ¶ 11]. Both students received some form of discipline, though the parties dispute the adequacy of this response. [Id.; ECF No. 22 at 4]. A day later, after his request to be reinstated to the baseball team was denied, a student posted on social media that Silva was a "snitch," and "Darius is a little bitch" was written on the walls of the locker room. [SOMF ¶ 13; ECF No. 22 at 4-5]. Principal Rubin contacted the parents of this student and another student who had reacted to the post. [SOMF ¶ 14]. On March 25, 2019, Principal Rubin sent a letter to the UHS community and held a meeting with the baseball team and school administration to address these issues. [Id. at ¶ 15; ECF No. 22 at 5]. Principal Rubin also sent a letter to the families of the UHS baseball team. [SOMF ¶ 15].

In April 2019, the school assigned the Director of Pupil Services to formally investigate incidents of racism. [SOMF ¶ 16; ECF No. 22 at 5-6]. Principal Rubin also contacted the Anti-Defamation League for assistance and arranged for training for students. [SOMF ¶ 15]. On or around this time, during a meeting with Principal Rubin, Silva and his mother questioned Principal Rubin's ability to help Silva, to which Principal Rubin allegedly responded, "this is

your fault." [ECF No. 22 at 7]. After this interaction, Silva requested to meet with the School

District superintendent Frank Tiano ("Tiano"). [Id.; see SOMF ¶ 21].

On May 8, 2019, Silva's father met with Principal Rubin and Assistant Principal

DiMeglio to express concern about the amount of playing time Silva had on the baseball team.

[SOMF ¶ 17]. The parties dispute whether Silva's limited playing time was due to his missing

practices because of injury, family funerals, and a vacation, or whether it was retaliatory in

nature. [Id.; ECF No. 22 at 6].

On June 4, 2019, a student reported to the school that he had heard another student refer

to Silva with a racial slur while filming him from outside the cafeteria. [SOMF ¶ 18; ECF No. 22

at 6]. The school reviewed surveillance footage and conducted interviews. [SOMF ¶ 18]. Upon

confirming the incident, Principal Rubin met with the student and his father, and the student was

disciplined. [Id.]. On or around the same time, Silva's father advised Principal Rubin that

football coach Bob Martellio ("Coach Martellio" or "Martellio") had referred to Silva as "boy"

during the football season. [SOMF ¶ 19; ECF No. 22 at 3]. Coach Martellio denied these

allegations, but was nevertheless removed from coaching the football team pending an

investigation. [SOMF ¶ 19]. The complaint was investigated but could not be sustained. [Id.].[4]

On June 6, 2019, other incidents of racial harassment allegedly occurred at football practice,

leading Silva's parents to file a complaint with the Department of Education's Office of Civil

Rights ("OCR"). [ECF No. 22 at 7-8].

Silva subsequently transferred to Northbridge High School for his senior year. [SOMF ¶

20; ECF No. 22 at 10]. The OCR sent an outcome letter to Silva's father on December 3, 2019,

---

[4] Silva also conceded at his deposition that he was not aware of racism during the football season, adding that he
was not aware of any racism at UHS from August 2018 to March 2019, when he first became aware that students
were referring to him with a racial slur. [SOMF ¶¶ 4-5].

stating that they had opened an investigation to determine whether Silva was subjected to a race-based hostile environment and whether the School District's response was inadequate.[5] [ECF No. 22 at 8-9]. The School District expressed willingness to resolve the complaint by taking steps set out in a Resolution Agreement between the School District and the OCR. [ECF No. 22 at 8]. Silva asserts that he suffered significant emotional trauma and distress requiring mental health counseling as a result of these experiences. [ECF No. 22 at 10]. He claims that he missed out on collegiate athletic scholarship opportunities due to lack of playing time and exposure caused by racial discrimination. [ECF No. 22 at 10]. Although he was accepted at Fitchburg State College and made the football team, Silva states that he was unable to continue his studies and play football there due to the "PTSD that Uxbridge gave me." [ECF No. 22 at 10].

## II.    Legal Standard

A motion for summary judgment under Fed. R. Civ. P. 56 will be granted "if the movant shows that there is no genuine dispute as to any material fact" such that the moving party is entitled to judgment as a matter of law. A movant must show that "there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). The burden shifts "to the nonmovant to establish the existence of at least one fact issue which is both 'genuine' and 'material.'" Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (collecting cases). The nonmovant "must present affirmative evidence in order to defeat a

---

[5] In the letter, the OCR concluded that the School District timely responded to all but one complaint of racial harassment or retaliation, noting that the only exception was a June 6 allegation for which the School District did not provide any documentation. [ECF No. 22-1 at 6]. The letter then goes on to recite all the measures and steps that the School District adopted in response to Silva's complaint. [Id.]. The OCR, nevertheless, expressed concern that the School District's response may not have followed through with reasonable or effective steps to eliminate the hostile environment for Silva. [Id.]. Importantly, the letter concludes with a statement expressly providing that it "should not be interpreted to address . . . any issues other than those addressed in this letter . . . . This letter is not a formal statement of OCR policy and should not be relied upon, cited, or construed as such." [Id. at 7 (emphasis added)].

properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

Issues are "genuine" when they require resolution from a finder of fact "because they may reasonably be resolved in favor of either party." Id. at 250. In other words, there must be "sufficient evidence supporting the claimed factual dispute . . . to require a jury or judge to resolve the parties' differing version of the truth at trial." Hahn v. Sargent, 523 F.2d 461, 464 (1st Cir. 1975) (quoting First Nat'l Bank of Ariz. v. Cities Serv. Co., 391 U.S. 253, 289 (1968)). The "material" aspect of a summary judgment motion requires that a fact affect the outcome of the case. Garside, 895 F.2d at 48 (quoting Anderson, 477 U.S. at 248). Material issues are ones that "need to be resolved before the related legal issues can be decided." Mack v. Great Atl. & Pac. Tea Co., Inc., 871 F.2d 179, 181 (1st Cir. 1989) (citing Greenberg v. P.R. Mar. Shipping Auth., 835 F.2d 932, 934 (1st Cir. 1987)). In analyzing motions for summary judgment, all reasonable inferences are drawn in favor of the nonmoving party. Gattineri v. Wynn MA, LLC, 63 F.4th 71, 85 (1st Cir. 2023) (quoting Doe v. Tr. of Bos. Coll., 892 F.3d 67, 79 (1st Cir. 2018)). Parties may not rely on "conclusory allegations or substantiated denials" and must take facts "derived from the pleadings, depositions, answers to interrogatories, admissions and affidavits to demonstrate either the existence or absence of an issue of fact." Magee v. United States, 121 F.3d 1, 3 (1st Cir. 1997) (citing Fed. R. Civ. P. 56(c) & (e)).

"Local Rule 56.1 was adopted to expedite the process of determining which facts are genuinely in dispute, so that the court may turn quickly to the usually more difficult task of determining whether the disputed issues are material." Butters v. Wells Fargo Advisors, LLC, No. 10-10072-MLW, 2012 WL 5959986, at *1 (D. Mass. Nov. 27, 2012) (quoting Brown v. Armstrong, 957 F. Supp. 1293, 1297 (D. Mass. 1997), aff'd, 129 F.3d 1252 (1st Cir. 1997)). The

non-moving party must state the specific facts that are disputed which prevent the granting of summary judgment. Brown, 957 F. Supp. at 1297 (citing Vasapolli v. Rostoff, 864 F. Supp. 215, 218 (D. Mass. 1993), aff'd, 39 F.3d 27 (1st Cir. 1994)). The nonmovant must "go beyond merely asserting the existence of a disputed and material fact[,]" and produce evidence that "substantially proves the existence of such a disputed fact." Lucia v. Prospect St. High Income Portfolio, Inc., No. 90-10781-MA, 1993 WL 761409, at *5 (D. Mass. Aug. 26, 1993) (citing Sheinkopf v. Stone, 927 F.2d 1259, 1262 (1st Cir. 1991)).

In any event, if there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party[,]" the Court will deny the motion. Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002) (quoting Anderson, 477 U.S. at 249). Otherwise, the motion should be granted.

### III.    Discussion

### A.  Motion to Strike [ECF No. 24]

Before the Court reach Defendants' motion for summary judgment, it must consider the pending motion to strike portions of the summary judgment record. [See ECF No. 24]. Defendants request that the Court strike Silva's opposition to the motion for summary judgment [ECF No. 22] as well as the exhibits attached thereto [ECF No. 22-1]. As it refers to Silva's opposition, Defendants claim that the filing was untimely because the Court's electronic order amending the scheduling order provided a deadline for dispositive motions on June 17, 2024. [ECF No. 24 at 2]. The electronic order, [ECF No. 16], did not otherwise provide a deadline for oppositions unlike the Parties' Joint Motion to Amend the Scheduling Order, [ECF No. 15], which proposed a deadline for oppositions "within 30 days after service of the motion [for summary judgment]," [id. at 2]. In Defendants' view, properly understood, Local Rule 56.1

governed, which provides that "[o]ppositions to motions for summary judgment must be filed, unless the court orders otherwise, within 21 days after the motion is served." Silva would have thus had until July 8, 2024, to file his opposition to the motion for summary judgment. Nevertheless, as Silva rightly points out, the Court's electronic order granted the Parties' Joint Motion, and it did so in full. [ECF No. 16 ("District Judge Margaret R. Guzman: ELECTRONIC ORDER entered granting [ECF No.] 15 Motion for Extension of Time to Complete Discovery.")]. Indeed, the order did not provide that the Court granted in part and denied in part the Parties' Joint Motion. [Id.] To hold otherwise would be plainly unfair to Silva. Even assuming Defendants were correct, and Silva's deadline was in fact July 8, 2024, the Court is unconvinced that his filing on July 16, 2024, 8 days after the deadline, presented any prejudice to the Defendants, particularly in light of the fact Defendants had agreed to the proposed 30-day deadline in the Joint Motion. [ECF No. 15 at 2].

With regard to the exhibits supporting Silva's opposition, Defendants object on grounds of hearsay and authentication. [ECF No. 24 at 1]. While the motion to strike is devoid of any analysis, it singles out the OCR's letter, email communications from Silva's father, and a police report. [Id.; ECF No. 22-1 (Exhibits 1, 3-5)]. Federal Rule of Civil Procedure 56 governs summary judgment and requires parties to support their assertions by "citing to particular parts of materials in the record, including depositions, documents . . . or other materials." Fed. R. Civ. P. 56(c)(1)(A); see Fernandes v. Criterion Child Enrichment, Inc., No. 4:21-CV-40124-MRG, 2024 WL 4393330, at *6 (D. Mass. Sept. 30, 2024). "'[I]n opposing a motion for summary judgment, a plaintiff must proffer admissible evidence that could be accepted by a rational trier of fact as sufficient to establish the necessary proposition.'" Gomez-Gonzalez v. Rural Opportunities, Inc., 626 F.3d 654, 662 n.3 (1st Cir. 2010) (quoting Gorski v. N.H. Dep't of Corr., 290 F.3d 466, 475-

76 (1st Cir. 2002) (emphases added); see also Fed. R. Civ. P. 56(c)(2) ("A party may object that a material cited to support or dispute a fact cannot be presented in admissible form."). Some forms of evidence, such as affidavits and declarations, may be considered on summary judgment even if they would not be admissible at trial, as long they "set out facts that would be admissible in evidence" if the affiant or declarant testified to them at trial. Fed. R. Civ. P. 56(c)(4). In the instant case, Silva relies on documents written by third parties who, to the Court's knowledge, have not given sworn statements or been deposed. [See generally ECF Nos. 1, 22]. The OCR letter, the emails, and the police report are all documents that, if introduced for the truth of the matter asserted, fit the definition of hearsay. Hannon v. Beard, 645 F.3d 45, 49 (1st Cir. 2011) ("It is black-letter law that hearsay evidence cannot be considered on summary judgment for the truth of the matter asserted."). However, both the OCR letter and the police report fall within the business record exception, Fed. R. Evid. 803(6), and, to the extent the emails provide statements by Defendants Rubin, Tiano, and DiMeglio, satisfy the party-opponent statement exclusion to hearsay, Fed. R. Evid. 801(d)(2).[6]

With respect to the documents' authentication, Defendants' only assertion is that they "were not properly authenticated." [ECF No. 24 at 1]. This argument is also without merit. Although evidence must be capable of authentication at trial, it need not be presented in admissible form on summary judgment. Nasir v. Town of Foxborough, No. 19-cv-11196-DJC, 2022 WL 375300, at *2 (D. Mass. Feb. 7, 2022) (citing Joseph v. Lincare, Inc., 989 F.3d 147, 155 n.4 (1st Cir. 2021)). "Because the court presumes that Plaintiff could authenticate these documents at trial by calling [a witness with knowledge] to testify, the court will consider them

---

[6] To the extent the emails provide statements by Silva's father and Silva introduces those statements to prove the truth of the matter asserted, they are inadmissible hearsay. See Fed. R. Evid. 801, 803. Silva does not otherwise offer any arguments as to why these statements may be admissible pursuant to an exception to the rule against hearsay or for a purpose other than the truth of the matter asserted.

as part of the summary judgment record." Steele v. U.S. Dep't of Hous. & Urban Dev., No. 3:17-cv-30049-KAR, 2022 WL 4096928, at *1 (D. Mass. Sept. 7, 2022). Moreover, to the extent the original OCR letter and police report bear a seal and signature purporting to be an execution or attestation, they are self-authenticating under Fed. R. Evid. 902(1). Id.

Accordingly, Defendants' Motion to Strike [ECF No. 24] is **DENIED**.

### B. Motion for Summary Judgment [ECF No. 19]

#### a. Count I: 42 U.S.C. § 1983

Silva asserts that Defendants violated his right to Equal Protection under the Fourteenth Amendment. [ECF No. 1 ¶¶ 48-54]. Section 1983 "is a vehicle through which individuals may sue certain persons for depriving them of federally assured rights," including the Fourteenth Amendment's right to equal protection of the law. Gagliardi v. Sullivan, 513 F.3d 301, 306 (1st Cir. 2008). In order to succeed on a Section 1983 claim, a plaintiff must show that defendants acted under the color of state law, and that his or her conduct deprived plaintiff of rights secured by the Constitution or by federal law. Id. (citing Rodriguez-Cirilo v. Garcia, 115 F.3d 50, 52 (1st Cir. 1997)). Vicarious liability is inapplicable to Section 1983 claims. See Welch v. City of Biddeford Police Dep't, 12 F.4th 70, 75-76 (1st Cir. 2021) ("Officers are not liable under § 1983 for the actions of other officers"). As such, "a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009).

The Equal Protection Clause "prohibits a state from treating similarly situated persons differently because of their classification in a particular group." Mulero-Carrillo v. Román-Hernández, 790 F.3d 99, 105-106 (1st Cir. 2015). "An equal protection claim requires 'proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such

selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person.'" Freeman v. Town of Hudson, 714 F.3d 29, 38 (1st Cir. 2013) (quoting Rubinovitz v. Rogato, 60 F.3d 906, 909-10 (1st Cir. 1995)). In the context of student-on-student harassment, the plaintiff must demonstrate that school officials "treated [him] differently from others similarly situated, either intentionally or with deliberate indifference." Doe v. Town of Stoughton, No. 12-cv-10467-PBS, 2013 WL 6498959, at *4 (D. Mass. Dec. 10, 2013). Accordingly, the plaintiff "must identify his [or her] putative comparators," Harron v. Town of Franklin, 660 F.3d 531, 537 (1st Cir. 2011), and "adduce competent evidence of purposeful discrimination." Melendez-Garcia v. Sanchez, 629 F.3d 25, 38 (1st Cir. 2010) (quoting Hayden v. Grayson, 134 F.3d 449, 453 (1st Cir. 1998)).

In the instant case, Silva has failed to identify specific comparators who were similarly situated but treated differently. In his opposition, Silva avers that he has "identified 'specific instances' where persons situated similarly in all relevant aspects were treated differently," [ECF No. 22 at 14-15], but does not actually name or describe these purported comparators. Without identifying specific comparators, Silva cannot establish the first prong of his equal protection claim—that he was selectively treated compared to others similarly situated. See Harron, 660 F.3d at 537; Cumby v. Am. Med. Response, Inc., No. 18-30050-MGM, 2019 WL 9244983, at *6 (D. Mass. Oct. 31, 2019) (dismissing equal protection claim because plaintiff failed to identify putative comparators). This is fatal to Silva's equal protection claim against the individual Defendants. The Court, therefore, need not analyze the remaining elements of the claim. Accordingly, summary judgment must be granted as to Count I.

### b. Count II: Equal Protection

Silva also asserts an Equal Protection claim against the Town and the School District. [ECF No. 1 ¶¶ 55-66]. To succeed on his claim, Silva must show that the harassment was the result of municipal custom, policy, or practice. Monell v. Dep't of Soc. Servs. of the City of N.Y., 436 U.S. 658, 691 (1978). "Official municipal policy includes the decisions of a government's lawmakers, the acts of its policymaking officials, and practices so persistent and widespread as to practically have the force of law." Connick v. Thompson, 563 U.S. 51, 61 (2011). Silva can establish the existence of an official policy by showing that the alleged injury was caused "by a person with final policymaking authority." Welch v. Ciampa, 542 F.3d 927, 941 (1st Cir. 2008). Municipal liability under Section 1983 only attaches where the individual actor has final authority to establish policy with respect to the subject matter in question. Walden v. City of Providence, 596 F.3d 38, 56-57 (1st Cir. 2010). "The fact that a particular official— even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." Pembauer v. City of Cincinnati, 475 U.S. 469, 481-82 (1986). However, if authorized policymakers "approve a subordinate's decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final." City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988).

Defendants contend that they are entitled to summary judgment because Silva has failed to identify any policy, custom, pattern, or practice that caused the alleged constitutional injury. [ECF No. 20 at 9]. Consistent with the holding in Monell and the text of Section 1983, a "plaintiff . . . may be able to recover from a municipality without adducing evidence of an affirmative decision by policymakers if able to prove that the challenged action was pursuant to a

state 'custom or usage.'" Pembaur, 475 U.S. at 481 n.10; accord Monell, 436 U.S. at 690-91. In

such instances, a plaintiff must show that: "(1) the custom is so well settled and widespread that

the policymaking officials of the municipality can be said to have either actual or constructive

knowledge of it yet did nothing to end the practice; and (2) the custom must have been the cause

of and the moving force behind the constitutional violation." Doe v. City of Northampton, 738 F.

Supp. 3d 93, 100 (D. Mass. 2024) (quoting Thomas v. Town of Chelmsford, 267 F. Supp. 3d

279, 306 (D. Mass. 2017) (cleaned up).

 In the instant case, Silva points to the OCR letter, [ECF No. 22-1 at 1-10], that he claims

shows "a consistent pattern of inadequate responses to racial harassment" that "amounts to a

policy or custom of deliberate indifference[.]" [ECF No. 22 at 15]. The letter, however, makes

clear that it "is not a formal statement of OCR policy and should not be relied upon, cited, or

construed as such. OCR's formal policy statements are approved by a duly authorized OCR

official and made available to the public." [ECF No. 22-1 at 7]. The letter cannot therefore

contain any conclusive findings. See Black v. Metro. Sch. Dist. of New Durham Twp., No. 3:16-

CV-074 JD, 2018 WL 4352629, at *7 (N.D. Ind. Sept. 12, 2018) (finding that a OCR letter

"creates no issue of triable fact" in granting summary judgment); Akron Bd. of Educ. v. Wallace,

No. 5:16CV188, 2016 WL 11812147, at *2 (N.D. Ohio Sept. 6, 2016) (finding that OCR letter

"was never intended to be used as binding precedent" in light of statement). Because Silva failed

to point to any additional evidence talking to Defendants' policies, customs, or practices that

would sufficiently raise a genuine dispute of material fact, the Court will grant summary

judgment. This holding applies equally to Silva's allegations claiming that both the Town and

the School District failed to adequately train administrators and employees on how to recognize,

address, and prevent racial harassment and discrimination against students. Given that Silva

failed to proffer any evidence on Defendants' training policies, customs, or practices, there is no genuine dispute of material fact.

### c. Count III: Title VI

Silva alleges that Defendants violated his civil rights when they failed to act to remedy the harassment, discrimination, and disparate treatment he experienced at UHS. [ECF No. 1 ¶¶ 67-76]. Title VI of the Civil Rights Act of 1964 provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d. Recipients of federal financial assistance are prohibited from discriminating on the basis of race, color, or national origin with respect to the operation of the recipient's covered programs or activities. See Pollard v. Georgetown Sch. Dist., 132 F. Supp. 3d 208, 230 (D. Mass. 2015). Because "individuals cannot be held liable under Title VI," id. at 229-30, summary judgment must be granted as to Tiano, Rubin, DiMeglio, and Martellio. With respect to the Town and School District, they may be liable if they were, through the actions of officials, deliberately indifferent to known acts of student-on-student harassment and the harasser was under the school district's disciplinary authority. Thomas v. Springfield Sch. Comm., 59 F. Supp. 3d 294, 301 (D. Mass. 2014) (quoting Davis v. Monroe Cnty. Bd. of Educ., 526 U.S. 629, 647 (1999).

An institution that receives federal funding is deliberately indifferent to student-on-student harassment if its response to the mistreatment is "clearly unreasonable in light of the known circumstances." Davis, 526 U.S. 629, 648. The deliberate indifference standard "has considerable bite," Santiago v. Puerto Rico, 655 F.3d 61, 73 (1st Cir. 2011), "requir[ing] more than a showing that the institution's response to harassment was less than ideal." Fitzgerald v.

Barnstable Sch. Comm., 504 F.3d 165, 171 (1st Cir. 2007), rev'd on other grounds, 555 U.S. 246

(2009). Deliberate indifference means "affirmatively choosing to do the wrong thing, or doing

nothing, despite knowing what the law requires." StandWithUs Ctr. for Legal Just. v. Mass. Inst.

of Tech., 742 F. Supp. 3d 133, 142 (D. Mass. 2024). In a nutshell, Silva must show that

Defendants "either did nothing or failed to take additional reasonable measures after [they]

learned that its initial remedies were ineffective." Porto v. Town of Tewksbury, 488 F.3d 67, 73

(1st Cir. 2007).

      In order to establish liability on a deliberate indifference claim, five elements must be

met:

> (1) plaintiffs were "subject to 'severe, pervasive, and objectively offensive' . . .
> harassment"; (2) the harassment "caused the plaintiff to be deprived of educational
> opportunities or benefits"; (3) the school "knew of the harassment"; (4) the
> harassment occurred "in its programs and activities"; and (5) the school "was
> deliberately indifferent to the harassment such that its response (or lack thereof) is
> clearly unreasonable in light of the known circumstances."

Kestenbaum v. President & Fellows of Harv. Coll., 743 F. Supp. 3d 297, 308 (D. Mass. 2024)

(quoting Porto, 488 F.3d at 72-73). In addition, it must be shown that Defendants acted with

discriminatory intent. See Doe v. Brown Univ., 43 F.4th 195, 208 (1st Cir. 2022).

      The parties present conflicting evidence about the severity and pervasiveness of the

harassment as well as the adequacy of the school's response. Silva has provided evidence that he

was repeatedly subjected to racial slurs, including being called "colla" (which he alleges is a slur

equivalent to the n-word) and directly called the n-word on multiple occasions. [ECF No. 22 at

2-8]. He further alleges that the harassment began during football season and continued

throughout the school year, occurring in various settings, including classrooms, the cafeteria,

athletic fields, and on social media. [See id.]. Silva's evidence also includes allegations that he

was physically threatened and corned by other students in retaliation for reporting racial harassment, leading him to eat lunch in the bathroom to avoid confrontation. [Id. at 4].

Defendants contend that they are entitled to summary judgment because they took appropriate disciplinary action in response to each reported incident, including removing one student from the baseball team, holding meetings with the baseball team, creating a crisis response team, reaching out to the Anti-Defamation League, and implementing other remedial measures. [SOMF ¶¶ 7-9, 11, 15-16, 18-19]. This type of responsive actions would generally suffice to preclude a finding of deliberate indifference, as courts recognize that school administrators are entitled to deference when they respond reasonably to harassment, even if their responses ultimately prove ineffective. Davis, 526 U.S. at 648 ("School administrators will continue to enjoy the flexibility they require so long as funding recipients are deemed 'deliberately indifferent' to acts of student-on-student harassment only where the recipient's response to the harassment or lack thereof is clearly unreasonable in light of the known circumstances."). Moreover, the deliberate indifference standard does not require that a school take any particular disciplinary action or that the response be successful in eliminating all instances of harassment. Id. at 649 (clarifying that recipients of federal funding "must merely respond to known peer harassment in a manner that is clearly not unreasonable").

However, Silva contends that despite these measures, the harassment continued and even escalated throughout the year, suggesting that Defendants either failed to effectively implement remedial measures or failed to take additional reasonable measures after learning that the initial measures were defective. [See ECF No. 22 at 7-8]. This raises a genuine dispute as to whether Defendants crossed the line from an imperfect response to deliberate indifference by failing to take additional measures when they learned that the harassment was continuing. Indeed,

deliberate indifference can be established if an institution fails "to take additional reasonable measures after [learning] that its initial remedies were ineffective." <u>Porto</u>, 488 F.3d at 73.

Silva has provided evidence that the harassment affected his educational opportunities, including his participation in athletics and ultimately leading to his transfer to another school for his senior year. [ECF No. 22 at 10]. He has also alleged ongoing psychological impacts that affected his ability to play collegiate sports. [<u>Id.</u>]. While there is evidence that Defendants took some action in response to the reported harassment, there remains a genuine dispute of material fact as to whether their response rose to the level of deliberate indifference—that is, whether they "affirmatively [chose] to do the wrong thing, or [did] nothing, despite knowing what the law requires." <u>StandWithUs</u>, 742 F. Supp. 3d at 142. Specifically, the factual record contains disputes about whether Defendants ignored evidence that their initial remedies were ineffective and failed to implement additional measures to address the ongoing harassment. This is precisely the type of factual dispute that must be resolved by a jury.

Accordingly, summary judgment must be denied on the Title VI claim against the Town and School District.

### d.  Count IV: Negligence

Silva alleges that Defendants acted negligently by failing to adequately act to remedy the harassment, discrimination, and disparate treatment he experienced at UHS. [ECF No. 1 ¶¶ 77-80]. Under the Massachusetts Tort Claims Act ("MTCA"), individual officers cannot be held personally liable for injury caused by their negligent conduct within the scope of their employment. Section 2 of the MTCA unambiguously states that "no such public employee . . . shall be liable for any injury . . . caused by his negligent or wrongful act or omission while acting within the scope of his office or employment[.]" Mass. Gen. Laws ch. 258, § 2. Section 1 of the

MTCA defines a "public employer" to include cities and towns, and a "public employee" to include any full or part-time, temporary or permanent, and paid or unpaid employees of any public employer. See id. § 1; see also Caisse v. DuBois, 346 F.3d 213, 218 (1st Cir. 2003). Accordingly, summary judgment must be granted in favor of Tiano, Rubin, DiMeglio, and Martellio.

With respect to the claims against the Town and the School District, Massachusetts law requires that a plaintiff asserting a negligence claim against a public employer first present his or her claim in writing to the public employer's executive officer. McCarthy v. City of Newburyport, 252 F. App'x 328, 334 (1st Cir. 2007) (quoting Mass. Gen. Laws ch. 258, § 4). "[I]n the case of a city or town, presentment of a claim . . . shall be deemed sufficient if presented to any of the following: mayor, city manager, town manager, corporation counsel, city solicitor, town counsel, city clerk, town clerk, chairman of the board of selectmen, or executive secretary of the board of selectmen." Mass. Gen. Laws ch. 258, § 4. The statute otherwise defines "[e]xecutive officer of a public employer" as including "the board, directors, or committee of a district in the case of the public employers of a district," adding that "[w]ith respect to public employees of a school committee of a city or town, the public employer . . . shall be deemed to be said respective city or town." Id. § 1. The presentment requirement, "is not a mere technicality," Morales v. Desmarais, No. 12-cv-12096-LTS, 2013 WL 3208610, at *2 (D. Mass. June 21, 2013), and "must be made 'in strict compliance with the statute,'" Gilmore v. Commonwealth, 632 N.E.2d 838, 840 (Mass. 1994) (quoting Weaver v. Commonwealth, 438 N.E.2d 831, 834-35 (Mass. 1982)). As such, "actual presentment to the designated executive officer is required. The plaintiff cannot fulfill this prerequisite by constructive notice." Berube v. City of Northampton, 602 N.E.2d 560, 561 n.3 (Mass. 1992). "The presentment requirement is a

statutory condition precedent to recovery under the [MTCA] and failure to comply with the requirement prior to instituting suit is grounds for summary judgment." Federal Ins. Co. v. Bos. Water & Sewer Comm'n, 583 F. Supp. 2d 225, 231-32 (D. Mass. 2008) (citing Alex v. Bos. Water & Sewer Comm'n, 698 N.E.2d 404, 404 (1998)).

Defendants claim that they are entitled to summary judgment because Silva failed to make proper presentment of his claims on both the Town and the School District. [ECF No. 20 at 15]. In response, Silva alleges that he sent a presentment letter to the superintendent of Uxbridge Public Schools, Frank Tiano, [ECF No. 22 at 19], citing to a January 11, 2021, demand letter addressed to "Uxbridge Public Schools." [ECF No. 22-1 at 64-68]. As an initial matter, the School District is not an executive officer for purposes of presentment to the Town. Mass. Gen. Laws. ch. 258, §§ 1, 4. Even if the letter was sent to the superintendent, "a school superintendent is not an executive officer for purposes of presentment to a city." Doe v. Cambridge Pub. Schs., 194 N.E.3d 217, 221 (Mass. App. Ct. 2022). As the claim relates to the School District, the Court notes that the record is devoid of any evidence supporting that the letter, although addressed to "Uxbridge Public Schools," was actually delivered to the superintendent. [See ECF No. 22-1 at 64-70]. Even if Silva had adduced such evidence, we cannot conclude that the superintendent is considered an executive officer of the School District. See Mass. Gen. Laws ch. 258, § 4. While the superintendent can be considered as the highest-ranking official of the School District, "[t]he superintendent, however, is merely an employee of the school committee of the city, for whom the proper public employer for purposes of [Mass. Gen. Laws ch. 258, § 4] would also be the respective city." Doe v. Cambridge Pub. Schs., 194 N.E.3d at 222 (citing Mass. Gen. Laws ch. 71, § 59 (providing that school committees of a town can employ a superintendent of schools); Mass. Gen. Laws. ch. 258, § 1 (definition of "public employer" provides, in relevant part, that

"[w]ith respect to public employees of a school committee of a city or town, the public employer for purposes of [Mass. Gen. Laws ch. 258, § 4] shall be deemed to be said respective city or town"))[7] As such, "where the proper public employer to whom presentment should have been made was in fact the city, presentment to the superintendent was insufficient, as presentment ought to have been made to one of the individuals specifically listed in [Mass. Gen. Laws ch. 258, §§ 1, 4]." Doe v. Cambridge Pub. Schs., 194 N.E.3d at 222 (citing Holahan v. Medford, 474 N.E.2d 1117, 1118-19 (1985)). The Court will therefore grant summary judgment in Defendants favor.[8]

### e.   Count V: Intentional Infliction of Emotional Distress

Silva alleges that Defendants intentionally inflicted emotional distress upon him. [ECF No. 1 ¶¶ 81-83]. In order to establish a claim for intentional infliction of emotional distress ("IIED"), a plaintiff must show "(1) that [Defendants] intended, knew, or should have known that [their] conduct would cause emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct caused emotional distress; and (4) that the emotional distress was severe." Polay v. McMahon, 10 N.E.3d 1122, 1128 (Mass. 2014) (citing Howell v.

---

[7] The Court also takes judicial notice of the Town of Uxbridge's Charter. The Charter provides for a School Committee consisting of seven elected members, whose powers include the selection and termination of the superintendent. Uxbridge Charter art. 3, sec. 3 (May 23, 2023), https://www.uxbridge-ma.gov/sites/g/files/vyhlif3971/f/uploads/charter_05.23.2023.pdf. The Charter does not otherwise mention the superintendent again or provide for any superintendent functions within the School Committee.

[8] The Court acknowledges that strict compliance with the presentment requirement may be excused if a plaintiff can show that "despite defective presentment, the designated executive officer had actual notice of the written claim." Bellanti v. Boston Pub. Health Comm'n, 874 N.E.2d 401, 407 (Mass. App. Ct. 2007). Although the parties have not addressed this argument, the Court takes note of Silva's assertion that Defendants responded to his letter in February 2021. [See ECF No. 22 at 19]. A review of the supporting documentation shows that the response was prepared by the Town's insurer. [ECF No. 22-1 at 69]. However, constructive notice alone is insufficient to meet the presentment requirements. Berube v. City of Northampton, 602 N.E.2d at 561 n.3. Moreover, Silva has not presented evidence raising an inference that even though the letter was addressed generally to the School District, an executive officer, as defined in Mass. Gen. Laws ch. 258, §§ 1, 4, investigated, evaluated, and responded to the letter, thereby satisfying the ultimate purpose of the presentment requirement. See Lopez v. Lynn Hous. Auth., 800 N.E.2d 297, 299 (Mass. 2003) (finding compliance with presentment requirement where "the claim was ultimately received in writing and acted on by the appropriate executive officer, notwithstanding the fact that the presentment letters were not addressed directly to [the executive officer]"). This is fatal to Silva's claim.

Enterprise Publ. Co., 920 N.E.2d 1, 28 (Mass. 2010)). A plaintiff must also allege more than bare

assertions to demonstrate that the emotional distress was severe. Polay, 10 N.E.3d at 1130

(holding that statements that do "not constitute an allegation of fact but rather a recitation of the

element of severe emotional distress" do not suffice).

      The conduct for an IIED claim must "go beyond all possible bounds of decency, and [be]

regarded as atrocious, and utterly intolerable in a civilized community." Young v. Wells Fargo

Bank, N.A., 717 F.3d 224, 240 (1st Cir. 2013) (quoting Foley v. Polaroid Corp., 508 N.E.2d 72,

82 (Mass. 1987)). Dismissal is appropriate if the "conduct alleged in the complaint does not rise

to this level." Polay, 10 N.E.3d at 1128-29 (citing Beecy v. Pucciarelli, 441 N.E.2d 1035, 1040

(Mass. 1982). As Plaintiff urges, the trier of fact may "put as harsh a face on the actions of the

[defendants] as the basic facts would reasonably allow[,]" but the standard is still very high.

Richey v. Am. Auto. Ass'n, Inc., 406 N.E.2d 675, 678 (Mass. 1980) (finding that at worst, a

supervisor's decision to terminate plaintiff was "bad, unjust, and unkind[,]" but did not amount

to IIED even if plaintiff was particularly on edge); Polay, 10 N.E.3d at 1128.

      As an initial matter, summary judgment against the Town and School District must be

granted. The MTCA abrogates the Commonwealth's sovereign immunity and, subject to a

presentment requirement, permits the assertion of causes of action "against public employers for

the negligent or wrongful acts or omissions of their employees acting within the scope of their

employment." Nelson v. Salem State Coll., 845 N.E.2d 338, 348 (Mass. 2006) (citing Mass. Gen.

Laws ch. 258, § 2). "Intentional torts are expressly exempted from the [MTCA], and therefore a

public employer cannot be sued for its employee's intentionally tortious conduct." Id. (citing

Mass. Gen. Laws ch. 258, § 10(c)). Because IIED is an intentional tort, Silva does not an

actionable claim against the Town and the School District.

With respect to Coach Martellio, Silva alleges that Coach Martellio consistently referred to him as "boy" rather than by his name during football practice and in front of other coaches and students. [SOMF ¶ 19; ECF No. 22 at 3]. Silva further alleges that on June 6, 2019, Coach Martellio harassed him at practice by "continually confronting him and getting really close to his person and taunting him by saying 'what's wrong Darius, am I bothering you? What's wrong Darius, do I make you feel uncomfortable, just talk to me' laughing the entire time." [ECF No. 22 at 7]. This behavior allegedly occurred in the gym in front of other coaches and students, and made Silva feel "extremely scared and unsafe." [Id.] As for Defendants Rubin, Tiano, and DiMeglio, Silva claims they failed to take adequate measures to address the racial harassment he experienced. Specifically, Silva asserts that when he requested that one of the lead offenders not be allowed to walk at graduation, Defendant Rubin told him to "be strong and move on" and that "this is not a big enough issue for me to take away that privilege." [Id. at 7]. Defendants contend that allegations of deliberate indifference or passive conduct do not state a claim for IIED. [ECF No. 20 at 17]. Specifically, they claim that the alleged conduct, which they characterize as passive, does not rise to the level of "extreme or outrageous" behavior required for an IIED claim. [Id.]

Silva's claims against Rubin, Tiano, and DeMeglio are primarily based on allegations that they failed to adequately respond to reports of racial harassment, implement effective remedial measures, adequately investigate incidents, and to provide proper support to Silva. These allegations fundamentally involve passive conduct or inaction rather than affirmative acts directed at Silva. See Pollard, 132 F. Supp. 3d at 232 (dismissing IIED claim based on failure to act because "passive conduct is insufficient to state a claim" and collecting cases); Doe v. Bradshaw, No. 11-11593-DPW, 2013 WL 5236110, at *13 (D. Mass. Sept. 16, 2013) ("But

having deliberate indifference towards [the student's] rights does not mean that the defendant's actions were 'extreme and outrageous' or 'beyond all possible bounds of decency.'"). The alleged statement by Rubin that "this is your fault," while concerning, constitutes a single remark rather than a pattern of affirmative conduct directed at Silva. [See ECF No. 22 at 7]. Such passive conduct and isolated remarks do not form the basis for an IIED claim. Silva does not otherwise point to any affirmative actions by these individuals. Therefore, summary judgment must be granted in favor of Rubin, Tiano, and DiMeglio.

Unlike the other individual Defendants, Silva's allegations against Coach Martellio involve affirmative conduct directly targeted at Silva. Considering the inherent subjectivity in an IIED claim and taking the facts in the light most favorable to Silva, genuine issues of material fact remain that preclude the allowance of summary judgment. To start, there are genuine disputes of material fact regarding whether Martellio engaged in this conduct. The parties dispute whether Martellio called Silva "boy," which carries racial connotations, and Silva adds that Martellio engaged in harassing behavior. [SOMF ¶ 19; ECF No. 22 at 3, 7, 21]. Additionally, there are factual disputes regarding whether Silva was aware of or experienced racial animus during the football season, as the record contains statements that Silva "was not aware of racism during the football season" alongside claims that he was referred to as "boy" during this period. This inquiry goes to the heart of this claim. With respect to whether Martellio's alleged conduct would qualify as extreme and outrageous, if proven, this determination involves factual questions that should be resolved by a jury. Indeed, a reasonable jury could find that Martellio's alleged conduct, particularly in the context of the ongoing racial harassment Silva was experiencing, was sufficiently extreme and outrageous to support an IIED claim. See Young, 717 F.3d at 240. Similarly, questions about whether Martellio knew or should have known his alleged conduct

would cause emotional distress, whether his conduct caused Silva's distress, and whether that distress was severe involve disputed facts that a jury should decide. For instance, regarding the severity of Silva's emotional distress, Silva has presented evidence that he suffered emotional trauma requiring mental health counseling. [ECF No. 22 at 10]; see Kaiser v. Kirchick, 662 F. Supp. 3d 76, 104 (D. Mass. 2023) ("Under Massachusetts law, 'emotional distress may be deemed severe even if it does not produce any physical manifestations,' and plaintiffs may recover even without medical testimony." (quoting Sindi v. El-Moslimany, 896 F.3d 1, 22-23 (1st Cir. 2018)). Given these genuine disputes of material fact on each element of the IIED claim, summary judgment must be denied as to Martello.

### IV.    Conclusion

For the foregoing reasons, Defendant's Motion to Strike [ECF No. 24] is **DENIED** and Defendants' Motion for Summary Judgment [ECF No. 19] is **GRANTED IN PART** and **DENIED IN PART**. Summary judgment is granted in full as to Counts I, II, and IV. Summary judgment is also granted as to Count III as it relates to Tiano, Rubin, DiMeglio, and Martello, and Count V as it relates to Tiano, Rubin, and DiMeglio. Summary judgment is denied as to Count III as it relates to the Town and the School District, and Count V as it relates to Martello.

**SO ORDERED**.


Dated: March 24, 2025

  */s/ Margaret R. Guzman*  
Margaret R. Guzman  
United States District Judge